Patrick M. Flatley
United States Bankruptcy Judge

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

In re:                                    )
                                          )
WEST VIRGINIA HIGH TECHNOLOGY  )
CONSORTIUM FOUNDATION and      )          Case No. 16-bk-806
HT FOUNDATION HOLDINGS, INC.,  )          Jointly Administered
                                          )
                  Debtors.                )          Chapter 11
_____           )

## MEMORANDUM OPINION

### I. BACKGROUND

On March 6, 2017, the court conducted a hearing to consider Huntington National Bank's request that the court order the appointment of a trustee to administer the jointly administered Chapter 11 cases of West Virginia High Technology Consortium Foundation ("Foundation") and HT Foundation Holdings, Inc. ("Holdings") (together, the "Debtors"). On the eve of the hearing, the Creditor filed with the court a reply brief and voluminous exhibits. At the hearing, the Creditor indicated that, although it filed many lengthy exhibits, it intended to designate specific portions of several depositions to be considered by the court. Because the reply and exhibits were filed the night before the hearing, and because of the request to designate exhibits in such a fashion, the Debtors requested the opportunity to file a surreply, which the court granted. At the conclusion of the hearing, the court took the matter under advisement pending the Debtors' surreply. On March 13, 2017, the Debtors filed their surreply such that the Creditor's motion is now ripe for disposition.

The Creditor asserts that the court must order the appointment of a Chapter 11 trustee because the Debtors' current management is grossly incompetent and dishonest. Specifically, it argues that Foundation's continued engagement in research and development projects without conclusive proof that those projects financially benefit the Debtors' total operation is grossly incompetent. Moreover, they assert that the Debtors' current plan to cooperate with a non-debtor related entity to expand the scale of the technology park operated by the Debtors at a time when

1

the technology park is substantially under-occupied again demonstrates gross incompetence by management.  Finally, the Creditor asserts that the Debtors' CEO, James Estep, was dishonest on two separate occasions.

In response, the Debtors' assert that the Creditor has failed to meet its burden to demonstrate that cause exists for the appointment of a trustee.  First, the Debtor asserts that the research and development projects are not a cash drain on their operations.  Second, the Debtors assert that their managers and directors are well-informed about the financial health of the Debtors and make prudent business decisions consistent with the non-profit mission of the Debtor.  Third, the Debtors argue that the decision to cooperate with other entities to develop adjoining real estate is not gross incompetence; rather, it is a decision to attempt to generate new business and support the Debtors' nonprofit mission.  Finally, the Debtors assert that the Creditor fails to prove that Mr. Estep was dishonest at any point.  Thus, they assert that the Creditor failed to demonstrate cause exists for the appointment of a trustee.  Additionally, they assert that the appointment of a trustee is not in the best interest of creditors, equity holders, and other interests of the estate.

## II. DISCUSSION

Section 1104 of the Bankruptcy Code provides that the court shall order the appointment of a trustee in a Chapter 11 case if cause so requires.  The Bankruptcy Code provides a non-exhaustive list of what constitutes cause, including "fraud, dishonesty, incompetence, or gross management of the affairs of the debtor by current management, either before or after the commencement of the case."  11 U.S.C. § 1104(a)(1).  Additionally, courts have identified additional bases for the appointment of a Chapter 11 trustee including conflicts of interest, self-dealing, inadequate bookkeeping, and loss of creditor confidence.  *In re Ashley River Consulting, LLC,* Case No. 14-13406, 2015 WL 1540941, at *9 (Bankr. S.D.N.Y. March 31, 2015).  Upon a successful demonstration that cause exists, the appointment of a trustee is mandatory.  *In re Oklahoma Refining Co.*, 838 F.2d 1133, 1136 (10th Cir. 1988).

The determination of whether cause exists "is within the discretion of the court and due consideration must be given to the various interests involved in the bankruptcy proceeding." *Committee of Dalkon Shield Claimants v. A.H. Robins Co., Inc.*, 828 F.2d 239, 242 (4th Cir. 1987). Regardless of the precise form of the questioned conduct, the analysis necessary to determine if cause exists requires a "fact-sensitive determination that must be made on a case-by-case basis." *In re G-I Holdings*, 384 F.3d 313, 318 (3rd Cir. 2004).  Notably, mismanagement or incompetence

2

must be gross to justify the appointment of a trustee. *In re Evans*, 48 B.R. 46, 48 (Bankr. W.D. Tx. 1985) ("Every bankruptcy [involves] a certain level of incompetence or mismanagement. As a result, the courts have required a finding of more than simple mismanagement or incompetence.")

The court must also order the appointment of a trustee "if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate . . . ." 11 U.S.C. § 1104(a)(2). To determine whether the appointment of a trustee is in the best interests of the pertinent parties, courts employ a balancing test whereby they seek to determine whether "the benefits to all interests of the estate to be derived from a trustee outweigh the detriment to the estate." 7 *Collier on Bankruptcy* ¶ 1104.02[3][d][ii].

Notably, because "the Bankruptcy Code favors allowing a debtor in possession to continue managing its business operations, the appointment of a trustee in a Chapter 11 case is an extraordinary remedy; it 'is the exception rather than the rule.'" *In re Fraidin*, Case No. 94-1658, 43 F.3d 1466, *1 (4th Cir. Dec. 9, 1994) (unpublished) (quoting *In re U.S. Communications of Westchester, Inc.*, 123 B.R. 491, 495 (Bankr. S.D.N.Y. 1991). Moreover, "[t]he moving party has the burden of showing, by clear and convincing evidence," that the appointment of a trustee is necessary. *In re Davis*, Case No. 09-10198, 2010 WL 2640587, at *2 (Bankr. E.D.N.C. June 29, 2010) (citing *In re The 1031 Tax Group, LLC*, 374 B.R. 78, 85 (Bankr. S.D.N.Y. 2007).

Here, the Creditor first asserts that the Foundation continues to operate its research and development projects despite those projects failing to generate positive net operating income over the past eight years. It asserts that the Foundation continues to operate the research and development projects without sufficiently evaluating whether they cause a drain on the Debtors' overall business. Rather, it alleges that the Debtors' management is preoccupied with the non-profit purpose of the Debtors and is neglecting its financial responsibilities. Moreover, the Creditor speculates that the Foundation may only continue research and development work in order to justify (1) having a large staff and (2) highly compensating the Debtors' managers, particularly Mr. Estep. The Creditor further argues that the Debtors' gross mismanagement is evidenced by its alleged failures to clearly report the financial woes of its research and development projects to its Board of Directors. The essence of the Creditor's argument is that savvy management would eliminate the research and development portion of the Foundation's business, reduce staff, reduce executive compensation, and operate simply to manage the Debtors' real property. However, it asserts that the Debtors' management is not willing to do so and has not presented its Board of

3

Directors with sufficient financial data with which it could adequately evaluate management's performance and an appropriate range of alternative options for the operation of the Debtors while under financial distress.

The Debtors argue, in response, that research and development is not a cash drain on the Debtors' business, that they provide adequate reporting to their Board of Directors, and that the Creditor's proposition of eliminating research and development in favor of transitioning into a property management entity would contradict the Debtors' pursuit of their non-profit mission and would thus jeopardize the Debtors' tax-exempt status. In that regard, Stacey Layman, the Foundation's Director of Accounting and Finance, testified that net operating income is not an adequate measure of the financial health of a non-profit company. Rather, she testified that consideration of a non-profit's cash position indicates its financial health. Regarding the Debtors, she explained that they have more cash on hand now than they did when they filed for bankruptcy protection. She opined, therefore, that despite the Creditor's assertion to the contrary, the Debtors' consistent growth of cash on hand shows that research and development is sustainable.

Layman further testified that, although there was a time when the Debtors considered eliminating the research and development portion of its business, such consideration was because government sequestration left the Foundation with no research and development projects and little hope for obtaining future projects. Since then, however, the Foundation has been awarded several new research and development projects and is optimistic about the future of the research and development business line. Layman further asserted that research and development is self-sustaining whenever it has active government contracts as their costs are reimbursed dollar-for-dollar, or at a slight profit, by the government. However, she also indicated that there are costs related to research and development that may not be billed to clients.

The Creditor next argued that the Debtors are foolishly pursuing an opportunity to develop neighboring property in order to allow for the construction of new buildings that are intended to house government agencies. Particularly, the Foundation has sought a grant to develop a road in its office park. One of its non-debtor subsidiaries is donating land to facilitate the development of the road and neighboring property. The Creditor asserts that such expansion plans are shocking, irresponsible, and foolish, particularly at a time when the Debtors are unable to achieve maximum occupancy in their office buildings.

The Debtors admit that they are involved in the development of a road and have applied

for a federal grant to support its development.  However, as indicated by the deposition testimony of Brad Calandrelli, the Debtors' Director of Facilities, the purpose of the purported expansion is to allow for the construction of buildings designed to meet the needs of specific government agencies.  The Debtors assert that such construction supports their mission of developing technology-related jobs in northern West Virginia because the presence of new government agencies in the area will likely advance their effort to recruit ancillary businesses that may be interested in leasing space in the Debtors' technology park.  Thus, the Debtors assert that the Debtors are neither giving away estate property nor contributing to the development of new office buildings that will compete with their current property management efforts.

The Creditor finally points to several statements made by Estep, asserting that he is dishonest and has lied to it and the court on at least two occasions.  It points to Estep's attestation through a March 26, 2008 affidavit that the Debtors' real estate was not encumbered.  However, at that time, the Debtors' real estate was subject to a federal interest which granted the United States a security interest for its contingent claim totaling millions of dollars.[1]  The Creditor argues that Estep, as the CEO of an entity that routinely deals with government grants must have been knowledgeable about federal interests and thus knew of the encumbrance at that time.  The Creditor next points to a second allegedly dishonest communication between its agents and Mr. Estep that occurred on March 2, 2016.  At that time, Mr. Estep informed the Creditor that it was facing "the collapse of [its] R&D program" and that the Debtors intended to shut down the research and development program.  In contradiction to that claim, the Creditor points to the testimony of Estep, Layman, and various directors who all have stated that the Debtors never concluded that they would definitively shut down the research and development business line.

In response, the Debtors assert that the Creditor has not demonstrated that either of these claims were dishonest.  Rather, the Debtors asserted, through Estep's testimony, that the Debtors' general counsel informed Estep that its real property was unencumbered as of March 26, 2008.  Estep further stated that he was unaware of any right of the federal government to assert an encumbrance in the Debtors' real property and did not intend to mislead anyone by virtue of his

---

[1] The Economic Development Administration ("EDA") filed a proof of claim asserting that it has a contingent secured claim perfected through operation of law.  The EDA alleges that it made awards to the Debtors in amounts of $1,440,000, $976,000, $2,000,000, and $1,200,000.  It further asserts that if the Debtors' real property is sold, transferred, or otherwise used in a manner that constitutes an unauthorized use of the property, then it must be reimbursed.

affidavit. Moreover, the Debtors assert that they dispute the validity of the federal government's federal interest in their property. Regarding Estep's March 2, 2016 communication, the Debtors assert that his testimony showed that at that time he was genuinely concerned with the Debtors financial health and feared that the research and development business might be unsustainable. Estep testified, as did Ms. Layman, that the research and development operations are now rebounding.

Having considered the evidence and parties arguments, the court finds that the Creditor has failed to demonstrate by a clear and convincing margin that the Debtors' management is grossly mismanaging the Debtors, is incompetent, or is dishonest.

First, it is important to note that the Debtors are not-for-profit entities. The duties of directors and management in a not-for-profit company differ from those of a for-profit company. The Debtors are not required, under traditional circumstances, to maximize profits. Rather, they must pursue their philanthropic mission. *See* W. Va. §§ 31E-3-301, 8-830, and 8-831. Although, it should be noted that once in bankruptcy, the directors and management owe fiduciary obligations to creditors to ensure that the pursuit of their philanthropic mission is not financed on the backs of creditors without their consent. *In re Burton*, 416 B.R. 539, 547 (Bankr. N.D.W. Va. 2009). Nonetheless, the Debtors are not required to abandon their philanthropic mission. Thus, as long as the Debtors are able to pay their creditors, they are free to pursue their mission.

Here, this appears to be the case. The Debtors cash position is improving and the Creditor is receiving substantial adequate protection payments. The Debtors argue that the research and development business is not a cash drain and that the Creditor has failed to demonstrate that it is.[2] The Debtors indicated that previous financial troubles relating to research and development occurred when the Foundation did not have government contracts, and thus conducted some self-funded development in order to remain competitive for future contracts. However, the Debtors assert that the Foundation currently has several contracts and will be considered for several more,

---

[2] The Creditor successfully identified an area of concern regarding the Debtors' management. The parties dispute, and it is unclear to the court at this time, whether the research and development business is contributing positively to the Debtors' overall cash position. The Debtors did not provide much clarity on the topic despite being provided with the opportunity to do so. While disappointing, the Debtors' failure in that regard is not critical to the conclusions reached by the court on the Creditor's motion. However, it may be of consequence as the case progresses; especially for feasibility considerations in conjunction with confirmation proceedings.

particularly if it emerges from bankruptcy. The Debtors' management is entitled to exercise its business judgment so long as the judgment is well-informed, which it is in this case. Although the Creditor asserts that the Debtors failed to provide certain specific financial information to their Directors, the court is satisfied that the information provided, though not crystal clear, was sufficient to comport with their duties. Additionally, when asked, the Directors deposed by the Creditor stated that they were content with the financial reporting provided by management. Moreover, Ms. Layman testified that she frequently briefs Estep on financial matters, and Estep indicated that he was knowledgeable about the financial well-being of the Debtors as well. Although the reporting and analysis may not be as conclusive as the Creditor argues it needs to be, it is clear that neither management nor the Board of Directors has operated in the dark.

Moreover, the Debtors provided a rational explanation regarding its plans to assist in the development of a road and the potential development of new buildings near the Debtors' real estate. Again, the Debtors' management is entitled to exercise reasonable business judgment, and an attempt to recruit new anchors for job growth is both aligned with the Debtors' charitable purpose and attract new tenants to the Debtors' properties.

As discussed above, a mere showing of mismanagement is not cause for the mandatory appointment of a trustee. Although the Debtors' management has not perfectly navigated this bankruptcy, or the years preceding it, the Creditor has not shown that Estep or anyone else is grossly mismanaging the Debtors or that they are incompetent.

Moreover, the Creditor failed to show that Estep has been dishonest. While it is true that the affidavit signed by Estep on March 26, 2008, may be inaccurate as there is now a disputed federal interest, the Creditor did not provide sufficient evidence to prove that Estep was aware of the federal interest. Of note, although Estep is deeply experienced with grant applications and property development, Estep is not a lawyer. Insofar as the effectiveness of a federal interest without recordation stems from case law, it is plausible, if not probable, that a layman would be unaware of such an interest encumbering real property. Moreover, Estep indicates that he relied upon the report that the property was unencumbered by the Debtors' general counsel. That reliance is justified. Regarding the March 2, 2016 communication, the Creditor again fails to demonstrate that Estep was dishonest. The record is clear that the Debtors were in crisis at that time, and Estep's statement that the Foundation might need to cease its research and development efforts was justified. Though no formal decision to close that business line was under advisement at that

7

time, Estep's claim had validity, and the fact that it never materialized does not make the claim dishonest.

### III. CONCLUSION

Therefore, the Creditor has not identified any cause that justifies the appointment of a trustee. Furthermore, such an appointment would not be in the best interest of the creditors and other stakeholders. For instance, the appointment of a trustee comes at a cost. Not only would the trustee require compensation, but a trustee would need time to become familiar with the Debtors' business and operations. Moreover, the appointment of a trustee has several other risks. First, it is possible that the appointment of a trustee would jeopardize the ability of the Debtors to carry on their charitable missions. Second, the possibility exists that the Debtors would lose their tax-exempt status, and would thus incur substantial new financial obligations. Third, the Debtors' current management has, and is required to have, top secret security clearances with the government. It is unclear at this time how the appointment of a trustee would affect that requirement.

Therefore, for the reasons stated herein, the court will deny the Creditor's Motion to Appoint Trustee.